Estate of Salim Ackel, Alexander Ackel and Nassime Klink, Executors v. Commissioner.
Estate of Ackel v. Commissioner
Docket No. 61489.
United States Tax Court
T.C. Memo 1958-27; 1958 Tax Ct. Memo LEXIS 201; 17 T.C.M. (CCH) 110; T.C.M. (RIA) 58027; February 25, 1958
*201 Jarril F. Kaplan, Esq., for the petitioners. Earl C. Crouter, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in estate tax in the amount of $61,843.48. The sole issue is whether certain gifts of real estate were made in contemplation of death. Findings of Fact Stipulations of facts filed by the parties are incorporated herein by reference as part of these findings. Petitioners, the executors of the will of Salim Ackel, filed a Federal estate tax return with the collector of internal revenue at Phoenix, Arizona. Respondent increased the reported gross estate of $329,029.11 to $613,526.41 in the notice of deficiency. The increase was attributed to transfers during the life of the decedent. Decedent was born on August 6, 1873, and died on September 30, 1951, at the age of 78 years. He was divorced from his wife, Brigida, in 1941. In addition to his former wife, decedent was survived by his four children, Victoria Karam, Alexander Ackel, Edward Ackel and Lionel Ackel. The ages of the children at the time of trial were 56, 54, 51 and 49, respectively. For a number of years Edward had been a *202 "problem" to decedent. Edward was married and had three children; he was always out of work and his wife was committed to the Arizona State Hospital in 1937 or 1938. His three children lived with their grandmother, decedent's former wife. The decedent supported Edward and the children. During the years 1946, 1947 and 1948 decedent made loans to his son Lionel who was in need of financial assistance. These loans were repaid prior to August 1, 1949. On October 8, 1946, decedent executed his last will, put it in a sealed envelope, and gave the envelope to his son Alexander. He told Alexander that his will was in the envelope and asked him to put it in the safe. In 1947 the Commissioner of Internal Revenue determined a deficiency against decedent for failure to pay income taxes for the year 1944. Thereupon, decedent and the Commissioner became involved in controversy which lasted approximately two years. During this period the Commissioner determined that decedent was also liable for additional income taxes for the years 1946 and 1947. The amount of his liability for these years was settled on May 11, 1949, when the total deficiencies were determined to be approximately $29,000, *203 together with interest or penalties. Decedent was upset over the amount of the additional taxes he had to pay, and sought the advice of his personal counsel, as to how his future income tax liability might be reduced. His counsel referred him to an attorney specializing in taxation. The decedent asked the attorney if there was anything that could be done to soften his income tax burden in the future. The attorney asked for and received information from the decedent as to his income and expenses and the properties owned by him which produced income. After receiving this information the attorney made various computations to determine the effect gifts of some of decedent's properties would have on his income tax liability. He then recommended to decedent that as a means of reducing his income taxes he make gifts to members of his family of approximately half of his properties and told him the amount of gift taxes he would have to pay. Although the attorney considered the effect of the gifts on decedent's estate taxes, he did not discuss this with decedent, and in the conferences he had with decedent there was no mention of death, a will, or estate taxes. Decedent's son Alexander accompanied *204 him on some of his visits to the attorney's office, and there were occasions on which the attorney had conferences with Alexander alone on behalf of the decedent. The decedent did not want to part with any of his properties. He was not in favor of giving any of them to his children because he feared they would lose them. The amount of gift taxes he would have to pay was another element that made the attorney's recommendation unattractive to him. The attorney finally persuaded the decedent to make some gifts, but at the insistence of the decedent they were limited to three properties which, in the aggregate, were less than the attorney had recommended. The decedent decided who were to be the donees and beneficiaries of the gifts, and the attorney received this information either from the decedent or from his son Alexander. The legal documents necessary to effect the gifts were then prepared by the attorney or under his direction. In 1949 decedent made gifts of three parcels of real estate as follows: (a) On August 1, an undivided one-half interest in Lot 11, Block 35, Original Townsite of Phoenix (hereinafter called the "Jefferson Hotel") to Alexander Ackel and Agnes Ackel, his *205 wife. (b) On August 1, an undivided one-half interest in the Jefferson Hotel to Lionel Ackel and Evelyn Ackel, his wife. The Jefferson Hotel had a value of $99,086.75 on August 1, 1949. In the statement attached to the deficiency notice the respondent determined its value on September 30, 1951, to be $132,845.84. (c) On August 2, Lots 10 and 12, Block 91, Original Townsite of Phoenix (hereinafter called the "Balke Building") to Alexander Ackel and Victoria Karam, as trustees under a trust agreement dated July 22, 1949, hereinafter described. The principal beneficiaries of the trust are the three children of Edward, who were minors at the time of the transfer. The Balke Building had a value of $60,000 on August 2, 1949. In the statement attached to the deficiency notice the respondent determined its value on September 30, 1951 to be $92,029.21. (d) On December 13, the west 1/2 of Lot 8, Block 21, Original Townsite of Phoenix (hereinafter called the "Studio Building") to Victoria Karam. The Studio Building had a value of $56,500 on December 13, 1949. In the statement attached to the notice the respondent determined its value on September 30, 1951 to be $59,622.25. Decedent *206 had offered to make a gift of the Studio Building to Victoria Karam in August, 1949, when he made the other gifts. She refused to accept it, however, until the mortgage thereon was reduced, which was done by December 13, 1949 when the gift was actually made. Decedent filed a gift tax return on February 21, 1950. It was audited by respondent, and decedent paid the gift taxes due on the transfers in the amount of $31,407.02. The trust agreement under which the Balke Building is held by Alexander Ackel and Victoria Karam as trustees was executed by the decedent on July 22, 1949. The trust was to continue until June 1, 1970, unless sooner terminated under the terms of the trust agreement. The agreement provided, in part, as follows: "THIRD: THE EQUITABLE TITLE AND BENEFICIAL INTEREST. The equitable title and beneficial interest shall vest immediately in three equal shares in Daniel L. Ackel, Edward J. Ackel and Frederick S. Ackel and their respective heirs and assigns forever, exclusive of the Donor, and the Trustees for the time then being shall hold the property thereof for the benefit of said Daniel L. Ackel, Edward J. Ackel and Frederick S. Ackel but subject to the divesting *207 and charges and powers hereinafter set forth. * * *
"SIXTH: APPLICATION AND DISTRIBUTIONS. "A. From the net income of the trust the Trustees shall pay from time to time to Daniel L. Ackel, Edward J. Ackel and Frederick S. Ackel so much thereof as is, in the Trustees sole discretion, necessary for their education, enjoyment, maintenance and support. So much of the net income as is not distributed above in any calendar year shall be accumulated one-third for the benefit of Daniel S. Ackel, one-third for the benefit of Edward J. Ackel, and one-third for the benefit of Frederick S. Ackel. If in any calendar year the Trustees determine that the needs of Daniel S. Ackel, Edward J. Ackel or Frederick S. Ackel exceed the net income of the trust in said calendar year, and if there is accumulated income from prior years not distributed pursuant to this paragraph, then the Trustees may distribute from said accumulations so much thereof as, in their sole discretion, is necessary for the education, enjoyment, maintenance and support of the said Daniel S. Ackel, Edward J. Ackel and Frederick S. Ackel. "B. In the event that either Daniel S. Ackel, Edward J. Ackel or Frederick S. Ackel, *208 or any or all of them, die before the time set for termination of this trust, the Trustees may distribute from time to time to the widow or children of said deceased so much of the net income as in the Trustees sole discretion they deem necessary for the education, enjoyment, maintenance and support of said widow or widows or children of Daniel S. Ackel, Edward J. Ackel and Frederick S. Ackel. "C. If after making the payments provided for above in Sub-paragraphs A and B there remains net income from the current year or accumulations of net income from prior years, the Trustees shall pay to Edward S. Ackel, son of the Donor, so much thereof as is, in the Trustees sole discretion, necessary for the enjoyment, maintenance and support of said Edward S. Ackel, said amounts nevertheless not to exceed $4800.00 per year. The determination to make such payments shall rest solely with the Trustees and the above provisions are not to be construed as granting to the said Edward S. Ackel the right to require the Trustees to pay him any sums whatsoever. "D. Upon the death of the last to die of the persons mentioned above in Sub-paragraphs A, B & C, the Trustees shall distribute the trust assets, *209 together with any undistributed income, free and clear of any trust, to the persons named and in the manner provided for in the succeeding Sub-paragraph E. "E. Upon the termination of this trust the Trustees shall distribute the trust assets, together with any undistributed income, free and clear of any trust, in equal shares to the said Daniel S. Ackel, Edward J. Ackel and Frederick S. Ackel. In the event that Daniel S. Ackel shall not be living at the time set for termination of this trust, the Trustees shall distribute that portion of the trust assets that the said Daniel S. Ackel would have received had he the been living equally to the then living children of the said Daniel S. Ackel. In the event that Edward J. Ackel shall not be living at the time set for termination of this trust, the Trustees shall distribute that portion of the trust assets that the said Edward J. Ackel would have received had he then been living equally to the then living children of the said Edward J. Ackel. In the event that Frederick S. Ackel shall not be living at the time set for termination of this trust, the Trustees shall distribute that portion of the trust assets that the said Frederick S. Ackel *210 would have received had he then been living equally to the then living children of the said Frederick S. Ackel. If any of the said Daniel S. Ackel or Edward J. Ackel or Frederick S. Ackel shall not be living at the time set for termination of this trust and shall not leave children then living, then the Trustees shall distribute the trust assets, together with any undistributed income free and clear of any trust, to the survivor or survivors of said Daniel S. Ackel, Edward J. Ackel or Frederick S. Ackel equally, or their then living children as above provided. If none of the distributees designated above in this Sub-paragraph E are living at the date set for termination of this trust, then the trustees shall distribute the trust assets, together with any undistributed income, free and clear of any trust, in equal shares to Alexander S. Ackel, Lionel R. Ackel and Victoria A. Karam and their respective heirs and assigns forever, exclusive of the Donor." * * *
In decedent's will executed in 1946 he had provided for somewhat similar disposition upon his death of the three parcels of real estate which were the subject of the 1949 gifts. The principal differences were the following: *211 (i) Under the will each of decedent's sons, Alexander and Lionel, was to receive a one-half interest in the Jefferson Hotel, whereas under the terms of the 1949 gift each son and his wife were given a one-half interest in this hotel. (ii) The trust contained in the will provided that Edward Ackel was to $200receive per month of the income of the trust for life, whereas the 1949 trust provided that he was to receive $4,800 per annum at the discretion of the trustees. Before making the gifts in 1949, the decedent did not discuss his will with any of the members of his family, nor were they aware of its contents until after his death. Decedent's business was that of buying, selling and developing real estate. Before making the gifts his taxable income was approximately $50,000 per year. For many years before making the gifts, and even afterward, decedent was active, vigorous and mentally alert. He conducted his own business affairs and drove his own car. He had a good appetite and was stocky in build. He was strong both physically and mentally. Decedent walked a great deal and rode about extensively, looking at various properties. He enjoyed gardening and working in a citrus orchard. *212 He took trips every summer, including the summer before he died, visiting his family and friends in Los Angeles, San Diego, San Francisco and Oakland, California. His trips were usually by car or train. Decedent appeared to be in good health, and neither his family nor his friends knew him to be otherwise prior to his death. He never discussed his death, or any subject connected with death. He was very optimistic. He said that he was going to live to be 102 and always made plans for the future. On December 20, 1950, decedent had a respiratory infection and on December 23, 1950, decedent, for the first time, showed symptoms of heart failure. He was examined again on January 19, 1951, and no evidence of heart failure was found. Prior to December 20, 1950, decedent was in good health for a person his age and his appearance and mental health were better than average. From September 22, 1947, to December 20, 1950, he was at no time acutely ill and had no serious disorder. Decedent had occasional dizzy spells, almost always associated with a cold. His blood pressure was moderately elevated, he had moderate hardening of the arteries, a moderate heart murmur and some enlargement of the *213 heart which was not marked - none of which was serious but consistent with his age. Decedent saw his physician approximately 40 times on office visits between 1947 and August 1949; six of those visits took place between January 1, 1949 and August 1, 1949. On March 17, 1949, he complained of dizziness and was given phenobarbital. On March 23, 1949, he had a cold and was treated for it. On April 14, 1949, he came in for a check up. On April 19, 1949, he returned for the results of the check up. On May 31 and June 7, 1949, he consulted his physician about the removal of a benign fatty tumor on his shoulder. Decedent was proud of his appearance, upset that the tumor showed through his shirt and wanted it removed. Decedent had two electrocardiograms, both during the course of check ups, one September 22, 1947, and one on April 14, 1949. Both were normal for a person of his age. Decedent never indicated unusual or undue concern for his well-being. He did not discuss with his physician the subject of death. His physician had informed decedent of his blood pressure and the hardening of his arteries, and he advised decedent to avoid getting upset. But decedent was not confined to bed and *214 his physician told him to lead a normal life. The physician saw nothing in decedent's physical condition to indicate a necessity for limiting decedent's activities. On the day of his death, September 30, 1951, decedent had been playing cards at his nephew's house until approximately 9:00 P.M. He then drove his car home, and died within an hour. The death certificate stated that the cause of decedent's death was "Arteriosclerotic heart disease, Acute myocardial failure, Arteriosclerosis". The dominant motive of decedent in making the gifts was to reduce his future income tax liability. The transfers by decedent in 1949 were not made in contemplation of death. Opinion RAUM, Judge: The respondent determined that the decedent made the 1949 gifts in contemplation of death and that the value of the properties which were the subject matter of the gifts was, therefore, includible in decedent's gross estate. Petitioners had the burden of proving that this determination was erroneous. In order to sustain this burden it was incumbent upon them to establish that the thought of death was not the impelling cause of the transfers. See . *215 Being convinced that the petitioners have sustained their burden we have made a finding that the 1949 gifts were not made in contemplation of death. In reaching this conclusion we have carefully considered all of the evidence which sheds any light on the decedent's dominant motive in making the gifts. In 1949 he was in good health for a man of his age, and was optimistic about his chances of living to be a centenarian. Immediately prior to the consummation of the gifts he had been engaged in a controversy with the Commissioner of Internal Revenue involving deficiencies in income taxes determined for the years 1944, 1946, and 1947, and had to pay approximately $29,000 additional income taxes for those years. He became so disturbed by this episode that he sought legal advice about reducing his future income tax liability. An attorney recommended that he make gifts of certain of his income-producing properties to members of his family. Although decedent did not want to part with any of his properties, he decided to follow the recommendation as to three of the properties. He also decided that his three sons and daughter, and three children of his son Edward should be the donees and beneficiaries *216 of the gifts. A reference to his will made three years prior to the gifts discloses that he had provided for somewhat similar testamentary disposition of the three properties. The respondent stresses the similarity between the provisions of the will and the 1949 gifts, and contends that the dominant purpose of the decedent was to make transfers in 1949 in lieu of testamentary dispositions. He urges that we have here exactly the situation which the Court of Appeals for the Third Circuit had in mind in , where it said: "Undoubtedly, there may be cases where a comparison of a pattern of inter vivos gifts with a particular scheme of distribution set out in the donor's will, permits the inference that in making the gifts, the donor was merely anticipating his testamentary scheme." We do not agree with the respondent. Evidence that gifts are made to the natural objects of a donor's bounty and to the same persons who would have received the subject matter of the gifts under the donor's will does not necessarily establish that his dominant motive in making the gifts was to make substitutes for testamentary disposition, *217 and the court so held in the cited case. In the instant proceeding any inference that might be drawn from a comparison between the donor's dispositions by gift and those made in his will has been overcome by evidence that the decedent, notwithstanding his age, was in moderately good health at the time of the gifts, was active both mentally and physically, looked forward to many years of life, and was provoked into making the gifts by an unhappy experience relating to income taxes and a desire to reduce his future income taxes. Cf. . Decision will be entered for the petitioners.